Filed 3/20/14  P. v. King CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063533 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SDC239857) |
| MALIK AMEEN KING, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Thomas E. Robertson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Malik Ameen King guilty of one count of willfully discharging a firearm in a grossly negligent manner which could result in injury or death to a person. The trial court sentenced King to a prison term of two years. King appeals, contending there is insufficient evidence to show he intentionally discharged the firearm. We disagree.

FACTS

In January 2012, Ashley Oliver lived in an apartment complex in San Diego with her mother and a friend. King lived in the apartment located directly above Oliver. On the evening of January 22, 2012, Oliver and her mother heard a loud sound. They walked over to the living room where they noticed a bullet lodged into the floor. Upon further inspection, they noticed there was another bullet hole in the ceiling of one of the bedrooms and one more through the bedroom wall to the living room wall. Seeing that the bullet came through the ceiling, Oliver's mother went upstairs to investigate. On her way up the stairs, she ran into Erin Hayes, King's girlfriend. At the time of the incident, Hayes lived with King. Hayes was returning from a vacation and was not in the apartment with King when the shot was fired.

Hayes entered King's apartment. She saw King sitting alone in his bedroom with a .38 caliber handgun on a dresser nearby. She told King that a bullet was fired into the apartment below. Hayes described King as being "too relaxed" and "withdrawn" and appeared as if he did not know anything about the gunshot. No one called the police that night.

The next morning, Hayes called King's mother and asked her to recover the gun. King's mother and brother came to his apartment. King's brother took the gun and ammunition. He placed the items in a storage facility and provided them, months later, to the detective assigned to the case.

The apartment complex owner called the police the day after the incident. An officer arrived and spoke with Oliver. The officer observed the bullet holes in the wall and ceiling of Oliver's apartment. He went upstairs and knocked on the front door of King's apartment. The police eventually spoke with King and Hayes.

Months later, after King and Hayes moved out of their apartment, the police returned to the apartment complex. The police met with the apartment maintenance person who said he had found a bullet hole in King's former apartment. They pulled up the carpet of the bedroom and found the bullet hole. Upon seeing that the bullet hole in the floor of the bedroom in King's apartment was consistent with the bullet hole in the ceiling of Oliver's apartment, and analyzing the angles and trajectory of the bullet, the investigator concluded that "a bullet had been fired from inside the bedroom . . . of [King's] apartment . . . , the bullet had traveled at a donward 45-degree angle, through the floor, through the ceiling of [Oliver's] apartment . . . , through the bedroom wall of [Oliver's] apartment . . . , and came to rest in the living room/dining room or kitchen area of [Oliver's] apartment."

Police retrieved King's gun and ammunition. Forensic testing on the ammunition recovered from King's apartment and the bullet that was shot into Oliver's apartment showed that they were the same type of bullet. The testing showed that the bullet the

3

police found in Oliver's apartment matched the caliber of King's gun. The forensic analyst, however, could not determine if the bullet was shot from King's gun because of the impact damage on the bullet.

DISCUSSION

In reviewing the sufficiency of the evidence to support a conviction, we must determine " 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13, quoting *People v. Ainsworth* (1988) 45 Cal.3d 984, 1022.) The reviewing court's task is to review the whole record in the light most favorable to the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

King contends that since the statute prohibits the willful discharge of a firearm, evidence of intent to fire the firearm is required. King does not dispute that the evidence shows deactivation of the manual safety and forceful pulling of the trigger. Rather, he asserts the evidence does not support his conviction because there is no evidence that he knew the gun was loaded, and, therefore, there is no evidence that he intended to discharge the gun when he pulled the trigger. We reject his assertion.

Penal Code section 246.3 criminalizes the "willful[] discharge[] [of] a firearm in a grossly negligent manner which could result in injury or death to a person." (Undesignated statutory references are to the Penal Code.) The term " 'willfully' " requires the defendant to purposefully and intentionally commit the prohibited conduct. (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1438-1439 (*Jerry R.*).) As the *Jerry R.* court

4

stated, "[t]he prohibited conduct, the discharge of a firearm, is commonly understood to mean the firing or shooting of a weapon by expelling the charge or bullet." (*Id*. at p. 1439.) Therefore, the statute requires proof that the defendant purposefully and intentionally fired the firearm, "with the added requirement that the firing occurred in a grossly negligent manner which could result in injury or death." (*Ibid*.)

The defendant in *Jerry R*. was charged with violating section 246.3 when he shot one of his friends in the chest. (*In re Jerry R*., *supra*, 29 Cal.App.4th at pp. 1434-1435.) Defendant testified that he bought the gun from one of his friends prior to meeting up with another group of friends that included the victim. (*Id*. at p. 1436.) Defendant showed the gun to the victim. As he removed the clip that contained bullets from the gun, a bullet popped out. After he thought the gun was empty, the defendant started playing and waving the gun around. He then pointed the gun at the victim and the gun fired when the victim bumped him. The defendant testified he thought the gun was unloaded, as evidenced by his affirmative action to disarm the gun. (*Ibid*.) The *Jerry R*. court explained that an "honest belief that a gun is empty negatives the mental state of an intent to fire the gun." (*Id*. at p. 1441.) Consequently, the defendant did not willfully and intentionally discharge the gun.

Here, there was sufficient evidence in the record from which a jury could reasonably infer that King intended to discharge the weapon when he pulled the trigger. The People had a firearms and ammunition components expert testify in great detail regarding the necessary procedure to fire King's gun. The People relied on the expert to prove that the gun did not go off by accident, but it had been intentionally discharged.

5

The expert explained that King would have to possess a magazine. King would have to manually put the right caliber or type of ammunition in the magazine. The magazine would have to be placed into the magazine well of the gun. King would then have to release the slide to strip a cartridge from the magazine. Then, he would have to deactivate the safety mechanism and pull the trigger.

The expert also identified and explained the significance of multiple safety mechanisms of King's gun. One of the safety mechanisms is the thumb safety. The thumb safety is a manual safety which you "push up and down" in order to shoot the gun. In other words, the expert explained, the thumb safety prevents "anything from happening" with the gun. To discharge the gun, the thumb safety, located on the outside of the gun, needed to be manually deactivated. King's gun also had a firing pin safety. The firing pin safety is an internal mechanism that operates to prevent the firing pin from going forward, unless the trigger is pulled. Finally, King's gun had a disconnector. The purpose of the disconnector is to disconnect the trigger from the firing mechanism and "in order to connect it you have to let it go. Allow it to pop up and reconnect." The three safety mechanisms prevent the gun from accidently or unintentionally discharging. The expert testified that all safety mechanisms in King's gun functioned properly.

Unlike *Jerry R.*, the testimony of the expert shows that King did not take any affirmative steps to unload or otherwise deactivate the firing capabilities of the gun which could support a good faith belief that the gun was unloaded. King never stated that he believed the gun was empty. There is not a scintilla of evidence in the record that supports the notion that King had an "honest belief that [the] gun was empty." (*Jerry R.*,

6

*supra*, 29 Cal.App4th at p. 1440.)  To the contrary, the expert testified that to discharge the gun, King took affirmative steps to load the gun, disarm the manual safety and pull the trigger.  This is indicative of King's intent to discharge the gun.

Absent direct evidence that the gun was loaded, a defendant's own words, behavior and conduct in the course of an offense may support a rational fact finder's inference. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 12.)  Based on the expert's testimony, King's conduct of intentionally going through the systematic process of loading the magazine, loading the magazine into the gun, manually deactivating the thumb safety and pulling the trigger, supports a reasonable inference that King intentionally discharged the gun.

Substantial evidence supported the jury's finding that King intentionally discharged the gun.  We are unable to conclude that the jury could not reasonably make such a determination.

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

NARES, Acting P. J.

HALLER, J.

7